All rise. Illinois Federal Corp. 50th Division is now in session. Our participant today is Deputy Delores Poseidon. Please be seated. The clerk will call the first case. 121-05-07 Office of the State Fire Marshal v. Illinois Pollution Control Board Good afternoon, everyone. Welcome to the Illinois Appellate Court, 1st District, 5th Division. We have one case on the docket for today. With the attorneys who are going to argue, please step up and introduce yourselves so we know who you are. Good morning, Your Honors. Christopher Turner here from the Attorney General's Office representing the Petitioner of the Office of the State Fire Marshal. Thank you. Vanessa Horton on behalf of the Pollution Control Board. Thank you. Is anybody going to argue on behalf of Reliable? Patrick Shaw here on behalf of Reliable Stores. Thank you, Mr. Shaw. Ms. Horton and Mr. Shaw, have you got an agreement about how you're going to split time? Yes. I will start first and insert three minutes of time for Mr. Shaw. We'll allow 20 minutes for each side with an additional five minutes for rebuttal. We may shorten or extend that depending on the questions for the two appellees who are splitting time. Ms. Horton, if you can try to limit yourself to 10 minutes and then give the remaining time to your colleague. I do want to recognize for the record this is the first argument that we've had in the Fifth Division since we have been joined by our newest justice, Justice Raymond Mitchell. So welcome aboard, Justice Mitchell. With that, Mr. Turner, you may proceed when ready. Thank you, Your Honors. Good morning, Your Honors, Counsel. May it please the Court, I'm Christopher Turner, the Assistant Attorney General here on behalf of the Petitioner, the Office of the State Fire Marshal. This Court should reverse the Illinois Pollution Control Board's final administrative decision holding that Reliable Stores is eligible for reimbursement from the Underground Storage Tank Fund because the plain terms of the Environmental Protection Act do not provide reimbursement to underground tank owners like Reliable from the UST Fund for releases that originated from gas leaks in their above-ground equipment, regardless of whether those leaks reached the outside environment through additional defects in the under-dispenser containment systems. And if this Court finds that the provision at issue is ambiguous, the Court should defer to the Fire Marshal's reasonable interpretation of that statutory provision that it has been charged to administer. Mr. Turner, we're used to giving deference to administrative agencies all the time around here, but here we have a duel between two different administrative agencies, both of whom have a role in interpreting the regulation in question. So what gives the State Fire Marshal priorities, State Fire Marshal's interpretation priority over the Pollution Control Board's interpretation? When the Pollution Control Board is the one that provides the plenary hearing on the dispute. Thank you, Your Honor. Yes, there is no real authority, I think, directly on point in the Illinois courts about when you have this dueling agencies that both are charged with administration of the provision at issue. However, you should give greater deference to the Fire Marshal's interpretation because the Fire Marshal is the agency that's been specifically charged by the General Assembly to administer the provision that is at issue here. Now, the reason why the fact that it's the Board's decision that is on review is not the decisive factor is because that's the decisive factor for what standard of review to apply or who you should provide that standard of review to. So the Respondent's case authority, the Town and Country Utilities case and the other, the IEPA case, those cases looked at the standard of review, whether you should apply, the court should apply the manifest way to the evidence standard to the factual findings of the Board or the agency or local entity that it was reviewing. Counsel, if I may, going back to Town and Country, the case you just cited, doesn't that say that the Board's decision is subjective, is subject to judicial review, not any other entity that makes a decision before the Board? Correct, Your Honor. It does say that it's their decision that's subject to review, but the issue here is the deference. When the court applies deference to an agency, to their interpretation of a statutory provision that's ambiguous, that is a rule of statutory construction, which applies differently. Yeah, and then I understand, but just even thinking further on, I mean, what gives your organization, the Fire Marshal, standing to come forward here? I mean, so any subset of any administrative entity can allow those under them to have standing to review these things? Well, we do have standing under statute to raise this direct administrative review action and challenge the Board's decision. That's true both under the Environmental Protection Act, generally under 41, but also under the LUST program. I mean, we do have standing to challenge it. The question is, though, when you're going to interpret this, there is the Board that in the first instance should have deferred to the Fire Marshal's interpretation, because it is the agency that was enforcing the statute. Courts don't usually provide their deference simply because the agency, for instance, issued its position about the statute in question in a final administrative decision or in regulation. It is because it's the agency that's enforcing it. Sometimes we come into court, right, directly in court trying to enforce the Environmental Protection Act in a specific provision against an entity where there was no administrative proceedings below. Still, though, the rule of statutory construction, when there's a dispute over that provision, when you're trying to, if it's ambiguous, whether or not you defer to the agency, usually the Environmental Protection Agency and other provisions, you do it because they have been charged to administer it, and because they are then considered to have expertise and experience with administering that provision and to be an informed source of the legislative intent. So it's like other intrinsic aids that aid the court in construing an ambiguous provision. Now, we don't dispute that also the Board is generally also charged with administering that and the LUST program specifically as well. They are a deference, but we do believe that when the two are in dispute here, because the final marshal has been charged with administering the specific provision, it's the one that does this on a daily basis, does this over and over again, and applies the statute, and it is the greater source of, sorry, informed source of what the legislative intent of that eligibility provision is. Putting aside deference for a second, going to our standard of review, there seems to be case law all over the place. We have here an agency interpreting its own regulation, basically a regulation within its expertise on an undisputed set of facts. On one side, you could say this is strictly a legal issue and our review is de novo, but there's case law suggesting that application of a technical regulation to undisputed facts is reviewed under the clearly erroneous standard. Which position do you take and why? It's the de novo standard, Your Honor, because it is a pure issue of statutory construction here. We are not looking at it. We don't have an undisputed rule of law or standard that we're trying to apply to a certain set of facts. So like the board, we actually, as far as I'm aware, rule of law stores in the administrative proceedings. When it moved for summary judgment, right, for a judgment as a matter of law, it was because that this is a we are disputing over the meaning of the statutory provision. It's really the section 57.9A and the meaning of that provision of when is it released from the underground storage tank and related tank system. That's what its issue and that's what the parties dispute. It's not a standard with a set of factors that we're applying, which often happens in other provisions of the EPA, where at that point it would be the clearly erroneous standard. This really only fits under that in sort of a deconstructionist argument where every dispute, which is obviously where you're going to have real standing because the parties have a real dispute under a special set of facts, whether those facts fall on one side or the other of the competing interpretations. I mean, you're always going to have that case when you're having a question of statutory interpretation. Counsel, can I get the facts for a minute here? You had an investigator, Mr. Carbin, I think it was. Correct, Your Honor. Yeah. And I think one of his reports, he said that he saw three portholes that were open to the soil in investigating this leak. Did he not? I believe that's correct, Your Honor, yes. And that was going directly to the soil. But your argument is mostly that the source was above ground and not in the soil. Is that right? That is, Your Honor. Correct. How do we make sense of that? The relevant facts aren't disputed here. The source of the release, the original source, is a leak, a defective leak in the above ground equipment. It was in the piping above the shear valve, which is part of the above ground dispenser system, Your Honor. So there the gas was leaking from that, but it came down and got caught into the under dispenser containment system. And that is where the holes were, or the holes may be perhaps formed from the gasoline over time, and then leaked out into the outside environment. So that does get to the crux of the dispute between the respondents and us about what the meaning of this provision, that we believe that when something comes from the underground storage tank system, that's because it must have originated from leaks in that system, not whereas here it originates in defects and leaks in the above ground equipment, which find their way and migrate down to the underground, the UST system, and then enter the point of entry. The board's position is that the point of entry is the decisive factor here, that that is what shows you that the release comes from the UST system. The prior marshal, however, argues based on the prior current authority on the plain language, but also on the prior court authority in the Harlan case, that recognize that no, the design of the UST fund, the purpose is to address damage from leaking underground UST systems. That is, the special concerns and difficulties which arise from both maintaining, but then detecting problems in that underground system. Here, the problem originated from defects and leaks in the above ground equipment. That was, to a much greater degree, under reliable storage control. That is not what the purpose of the UST fund is to address. That's exactly the case we have here. In their argument, they believe that somehow our reading, for instance, would take the containment system, this underground containment system, and render it superfluous. It was under the definition, because no one disputes that the under-dispenser containment system is part of the UST system. We all agree that's the case. However, what the prior marshal is arguing is that it's contained in that, of course, to bring it under an entire regulatory regime. Certainly, you can still, as recognized by the federal regulations that we both cite to, that you can have leaks that originate underground within that system, within the piping within that system. It serves a purpose to include the containment system within the definition of the UST system. You do agree, even under the Pollution Control Board's interpretation, if the facts demonstrate that the leak is only coming, for instance, from the dispenser pump, and it's not going underground, then it's not covered by the fund. Correct, Your Honor. I don't believe that the Board disagrees with that either. I mean, I obviously can't speak to that. So there are plenty of scenarios under which the fund would not be tapped. Exactly, Your Honor. So there are other scenarios, and we believe that this class of releases, the releases when you have problems and leaks coming out of that above-ground equipment, which find their way into the UST system, but then through the UST system, find their way into the ground, those are still covered. The fact that reliable stores, in addition to having leaks and problems in the above-ground equipment, turned out to also have defects in their underground equipment, shouldn't entitle them to access to public funds from the UST fund to address that. Counselor, can I ask you, the statute was amended sometime, I think, in 1993, to add on four related tank systems. That language seems to be at odds, again, with what you're arguing. I mean, related tank systems, is that defined in the statute anywhere? No, Your Honor, I don't believe related tank systems define the statute. I think that the closest you get is in the Board's regulations, where they define the UST system. So how do we consider what that language would be? Does that expand what it was considered before? What expands it is certainly in the sense that now, for instance, it is clear that something is eligible if it originated within the under-dispenser containment system, the other piping, that did expand the scope to a certain degree of eligible releases, but only in the sense that, which actually was already recognized by the Board in its regulations before that amendment, that the other parts of the underground tank system, the piping and the other containment systems, not just under-dispenser, but there's also containment systems under the tank and under other aspects of the piping, that all those are included as parts sort of like the UST, that if you have any sort of leak that's released that's coming from that system, it is covered. But what that change amendment didn't address is the question we have here. It certainly didn't change the fact that when you have a release in the above-ground equipment, that it would be covered. And we believe that also, that when you have a release that originated from those leaks, is caused solely by the leaks in the above-ground equipment, even if it goes down to the UST system, it still should not be covered, because that still would contradict the purpose and design of the UST fund. Using the limited funds instead for a broader category of releases, which really don't raise the same unique difficulties as maintaining the underground system itself. And in addition, it will also disincentivize tank owners, like reliable stores, if they know that if they don't take adequate care of the above-ground equipment, of their dispenser systems, and they do leak, that they will be able to access public funds in order to finance their cleanups or any corrective action that they will need to take. Respondents also have raised the issue, suggesting that the Farr-Marshall's reading contradicts the purpose of the LUST program, because, well, if this release is not eligible, then they escape the regulation of the LUST program entirely. First of all, I caution the Court that the LUST program is a broad regulatory regime, that not everything you have to do under it is based on whether or not a release occurred. There's also the threat of release, and there's things you have to do to maintain the equipment before any release, which we'd probably still be subject to. But the key thing is, just like the Township of Harlem, in that Harlem case that we cite, and like the Greenville Airport Authority and the PCB case that we cite, all the cases that made this distinction originally between above-ground equipment and releases that come from the underground tank system, that those entities as well were still subject to environmental regulatory regimes. It wasn't like suddenly now they were free of any liability or obligation. When the General Assembly tried to, when it enacted regulations under the federal RCRA program, it was not just the LUST program. It was also the Gasoline Storage Act that the Farr-Marshall also administers. And it is a broad, overlapping regulatory regime for the underground tank systems. It includes also the above-ground equipment. And they would certainly continue to be regulated under that system, both for cleanup, inspection, and for other reasons. And also they would continue to be regulated under the Environmental Protection Act, generally, for any water pollution, air pollution, or ground pollution they caused. But wasn't Township of Harlem decided after the change in the statute about related tank systems? It was, Your Honor. Correct. Well, it was decided at the same time that based on the prior statute. So it was addressing the predecessor provision, which was almost identical to this one. But its holdings about the purpose of the USG fund remain. And as we reference to the legislative history, the legislative history of that 1993 amendment in no way suggests that they were trying to broaden the scope to cover above-ground or somehow broaden the class of releases that we're going to now be able to access and be eligible under the fund. Rather, the main concern there, the primary motivation, was the ongoing financial problems of the fund. And they wanted to make sure that it prioritized. They had the money to address and finance remediation for the higher-priority releases. So that is consistent, though, with the reading and the purpose of the USG fund that the court in Harlem recognized, that it is meant to address the unique problems rising from defects and leaks in the underground storage tank system and not in the above-ground equipment. We have about two minutes left. So unless you have any more questions, then I will sit down. Any other questions from the panel? All right, thank you. Thank you, Your Honor. Ms. Horton, you may proceed when ready. May I please report? My name is Vanessa Horton. I'm an attorney with the Illinois Pollution Control Board, and I have been appointed as a special assistant attorney general to represent the board in this matter. My name is Patrick Shaw of Reliable Stores, Incorporated. Thank you. I want to ask if you either can step closer to the mic or maybe move the mic or just speak louder, because we're not picking you up, all right? Any better? That's a little bit better. Okay. We're here today to urge this court to affirm the board's decision that Reliable is eligible to access the underground storage tank fund. The plain language of the Environmental Protection Act required the board to find the fire marshal erred in determining that there was no release from the tank system. The contested language of the Environmental Protection Act is actually quite straightforward. Section 57.9A states that the underground storage tank fund shall be accessible by owners and operators who have a confirmed release from an underground storage tank or related tank system of a substance listed in this section. The board applied this plain language and related definitions to the undisputed facts. With doing so, the calculus of the release becomes crystal clear. The under-dispenser containment leaked directly into the subsurface soil. The under-dispenser containment is part of the tank system. Therefore, there is a release from the tank system. Let me ask you the question I asked your opponent, which is, you know, we've got dueling agencies here. And they're saying we should give deference to sort of the first-line agency as opposed to the adjudicated agency. And I know you take the opposite position. Tell me why. The board sits in review of this fire marshal's decision. Any appeal of a fire marshal eligibility determination is made by the board. Certainly, the fire marshal is correct. It has employees who have longstanding experience with this issue. But the board is comprised of technically qualified members who have vast experience and are required to have experience in either environmental law, environmental policy, or environmental science. And currently, that is what comprises the board today. The decision made by the fire marshal is not a contested case. It's a four-word determination. It says non-UST system. It is only before the board, when this appeal comes to the board, that the party, that the owner-operator can have a contested case. It can present evidence. It can have a hearing. In this case, it was summary judgment. But it can brief the board upon the issues. Those are all things that are worthy of deference. And, in fact, the board is the agency here which is deserving of deference. And then the second question is, what's our standard of review? They say it's de novo. I take it you disagree. We agree. You agree it's completely de novo. We agree it's de novo, that the facts are undisputed. What is disputed is the application of the law. Counsel, can I ask you about the whole issue of related tank system? Is it defined in the act? Your Honor, it's in the board's administrative code regulations in 734.115. They define UST system and tank system to include not only the underground tank and connected underground piping, but also the containment system, which is the under-dispenser containment. So that is the related tank system. A release can only come or is that your question? I'm sorry, Your Honor. No, that's all right. But it's not in the act is my point. No. The board takes the reapply plain reading to both the definitions that are in the act and also the regulations that the board has promulgated based on the act. All right. Does that provide there might be some ambiguity here? We do not believe so. A release must reach the environment. In this case, there was a leak from above-ground dispenser into the under-dispenser containment. But the question is simple. Where did the gasoline enter the environment? Through the under-dispenser containment. Is it pretty much almost impossible then to not have a gas leak that doesn't affect the soil in some way? It seems like everything is covered. From Title 16? Yeah. For the leaking underground storage tank program, to access the fund, it has to be from an underground tank system or related tank. So the fire marshal provides several hypotheticals. What if instead of dripping straight down, it's sprayed sideways? That's not an issue here. The purpose of under-dispenser containment is to collect the leaks from the piping above. So the definition of under-dispenser containment is to do exactly what it did here, is to collect those leaks, and that is where the release came from. What if it collected a leak from an above-ground spill? In the familiar gas pumps that we all know, it's encased in metal or plastic. So it couldn't happen? No. It's directly underneath the ground of the dispenser. So its purpose is only to collect from the encasement of the dispenser above. Incredibly, the fire marshal agrees with the board that the under-dispenser containment is part of the tank system and that the under-dispenser containment here leaked gasoline into the subsurface environment. It is also undisputed that if a gasoline leak doesn't reach the environment, there can be no release as defined in Title 16. But the fire marshal fixates on whether the leak started above or below the shear valve. This distinction has no basis in law. The fire marshal bases its argument before this Court on three cases, Harlem, Ramada, and Greenville Airport. But all three cases involved a leak from a nozzle or hose to the ground surface. None of the cases involved a leak from a tank system into the subsurface environment. They simply don't support the fire marshal's interpretation. But the board's decision here is utterly consistent with all three of these cases. The controlling question for deciding whether a leak is a release from a UST or related tank system is not difficult to answer. From where did the gasoline escape to the environment? In this case, it's simple. From the under-dispenser containment. There seems to be a hint in their argument that when the Pollution Control Board issued its decision in this case, it was reversing its own prior precedent. Is that correct? Or are those prior cases like Harlem, were they distinguishable on the facts? The board believes they are completely distinguishable on the facts. Harlem was a gas pump that was left open overnight, dispensing 450 gallons of gasoline to the ground next to the dispenser. Greenville was a hose that ruptured when an airplane was filling up and spilled onto the asphalt next to the airplane. And Ramada was a fill of a bus in a garage and it spilled onto the concrete of the garage. So in those cases, they were basically surface spills. Exactly. They weren't underground spills. Yes. Okay. It was not at all from the underground storage. So is it fair to say that the set of facts that are presented in this case were, this is more or less a first impression issue for the board? Yes, this was a first impression issue. Under-dispenser containment is relatively new, a requirement for gasoline, for gas stations. I believe it's dating back from 2006. This is the first time that a denial of eligibility based on that from the fire marshal has been appealed to the board. Counsel. We have about two minutes. I'm sorry. Justice Connors, go ahead. So it really wasn't from the underground storage tank, technically speaking. It didn't. It's from the related tank system, which is allowed to be eligible from the fund. But that's how release is defined, is it not, in 57.2? It says disposing of petroleum from underground storage tank. Right. And then underground storage tank is defined in the board's regulations as comprising of containment system, which is what the UDC is. Your opponent relies on that section, you know, to make the argument. But you're saying there's an administrative rule that kind of trumps that or overwhelms it? Well, yes, Your Honor. The definition of it is from the board's regulations. The board is the one who has the global eye on the statute. There's many parts of it. The IEPA is in charge of a larger portion of the requirements of the leaking underground storage tank fund. So it's the board that hears appeals from IEPA and from the fire marshal, and the board interprets these, looking at our relations consistently. Okay. Thank you. I think your time is about up. Okay, so certainly. In conclusion, we ask that this Court affirm the board's decision in accord with the overarching purpose and plain language of the Environmental Protection Act. Thank you. Mr. Shaw? I may have pleased the Court. I am Patrick Shaw for Reliable Stores. I'd just reach out to a couple points. I don't think that have been made. I believe that we usually talk about deference to administrative agencies. We usually aren't talking about institutions or people. We're talking about the findings and conclusions they make. And we look at that, either if it's an administrative review from a board like the Pollution Control Board or if it's a court, we're evaluating the decision. And that stands out here. We're talking about deference to the state fire marshal because the state fire marshal's decision was basically a permitting licensing stamp. Yes, no. Non-UST. That is the sum of the decision that was reached that was a vital decision. And there's nothing to defer to there. There's no process to evaluate. We don't know what evidence was considered. It's only when you get to the Pollution Control Board that we have the proofs and we look at it. So really, keep in mind, OSFM has 60 days to review this. At the end of 60 days, it's over. It's an appealable decision. Then the parties take the case to the Pollution Control Board. It's only the Pollution Control Board that conclusions and facts, and we go back and forth, and we see what evidence should have been considered, what shouldn't have been considered. And that is the process by which deference can be granted to an institution by looking at their decision-making process and seeing if it's sound. And along those lines, I would add, when you appeal a decision, a non-decision, I should say, if the state fire marshal fails to make a decision on the application in 60 days, are we expected to defer to the state fire marshal's decision on appeal to the Pollution Control Board or an appeal to the court? They didn't make a decision. They had a chance to make the decision and make their case, and then it would have been the petitioner's burden to disprove that case on appeal. But there's nothing to defer to at that level. Again, that's because it's basic. It probably works 99% of the time. They can look at the materials. It's pretty simple, and that's all that's needed, and it does not need an appeal. But if there are controversies, as we say here, an issue of first impression, that's when you have an environmental body that is versed in environmental law. There's only two agencies I'm aware of that were created by the Illinois Environmental Protection Act, and that is the Pollution Control Board, which adjudicates and rule-makes an Illinois Environmental Protection Agency. These agencies are particularly interested in environmental issues, which always has to do with what goes into the environment. There are a lot of agencies at the state and local levels that deal with issues close to that, but all of the stuff the Environmental Protection Act is concerned about entering the environment. It doesn't enter the environment. It may be an issue somewhere else. It may be an issue in OSHA, MSHA, Department of Public Health, and the water supply. There's a lot of stuff that gets divided up, but this is an environmental law matter to be decided by the environmental law agencies, ultimately. If I had, I don't know if I'm running out of time, but one minute to act. Six minutes left. I will also just say what I wanted to emphasize in my brief, hopefully, was that the purpose of this program, somewhat to demystify it, is it's just an insurance program. Underground storage tanks containing friable material can be an environmental hazard, which we all can understand without even knowing anything about toxicology or chemistry. And like many other commercial activities, law requires insurance, not just for the benefit of the insured, but for the benefit of everybody who could be impacted by a calamity that could occur with something like this. The Attorney General argues that you really shouldn't consider this to be an insurance program and apply the principles of insurance law. For instance, construing the contract in favor of the insured and against the insurer. I understand. I'm going probably a little bit into apples and oranges to some extent in terms of textual analysis. But it still is supposed to be an insurance program. It's supposed to serve the function of an insurance program. And if we were faced with an insurance policy, we should come up with fairly similar results. That would be my take on that. This is maybe a question out of curiosity more than anything else, but what struck me when I read the briefs was how quickly all this was remediated. And obviously you've got this fund here. This is what we're talking about today. In the end, do gas stations end up getting the entire cost of their remediation paid for out of the fund, or is it only partial? Is it a percent, or how does that work? The insurance program has a deductible, so everybody's required to have a deductible to be paid. It used to be as much as $100,000. I think now it's like $5,000. They've been lowering it. And I believe that owners and operators are required to demonstrate the ability to pay the deductible. So they pay the deductible. There is a review process. The EPA reviews each step of the way because it's not just that it's a blessed program. It's a remediation program, but it's also state money, and they've got to make sure it's being spent wisely. They can run money that is not collectible for one reason or another. The other point I guess I'd like to emphasize is it sounds like the Attorney General's office is arguing that negligence is a consideration to preclude insurance coverage or coverage from the West Pole. Or moral hazard. That is to say, the owner-operator has a responsibility to maintain what's above ground. They're not responsible for what happens below ground, right? Owners and operators are liable to civil penalties and criminal penalties completely disassociated with what we're talking about here today. If the owner-operator violated a regulation, did something incorrectly, there are remedies. There is indications in this record of a notice of violation that was sent to my client, which was geared towards getting him to fix the containment and other things on the property. That situation itself could have escalated if steps were taken. It's also the specific problem with underground storage tank law. It's not visible. It's happening below ground, and they don't see it. That's how very small amounts of gasoline, daily, hourly, over years, gets to be a real big problem that nobody sees. But the moral hazard question, I would say there's no place for negligent exclusion under the Lust Fund. I think it would run in file with federal expectations. The federal law isn't trying to make things pleasant for the owner-operator of tanks. There are other ways to enforce the avenues available. But communities are affected by these releases. Neighbors are affected by these releases. Half of the Lust Fund is cleanup costs. The other half is third-party liability. It's basically kind of a property and a liability policy. Any police attorney will basically point out, if there's no insurance available, I may not have a case. My client may have injuries. They may not be compensable. And this is the insurance program in the state of Illinois. We have about a minute left. Okay. I would just request that you affirm the Pollution Control Board's decision. We think it was correctly decided. And just reiterate what I said in the conclusion of my response brief, that if you do remand to the board with your final decision, that allow authority for the board to consider any petition for legal costs authorized by the Illinois Road Protection Act. This decision, that issue is not before the appellate court. I just didn't want to make sure that that was. If this court were to affirm. Yes. This court would send a mandate back to the PCB. Yeah. All right. Is there a reason that we need to specifically give them jurisdiction back to consider costs? I've had a case in which attorney fees were awarded before the decision. Then it was appealed. And on the way back, the board did not believe it had authority to consider subsequent attorney fee petition. Fees occurred on the appeal. Where does the fee provision come from? Is it basically like a civil rights case where if you go to the board and you win or you lose and you get your fees? No one has mentioned this in the brief. It's the conclusion of my brief, which is probably not the best way to do it. Because I cite to a case where the mandate language is what I'm referencing. But section 57.8, parenthesis L, close parenthesis of the Illinois Bioprotection Act. It's 415 ILCS 57.8 L. Provides that attorney fees cannot be recovered as corrective action for cleanup of these cases unless a party prevails before the board. And the board has not made that decision. It's not before you guys. But the board has its own precedent on how it evaluates those. So I guess I was just trying to avoid a potential issue on remand if you don't say anything. But maybe there is no issue. If we were to affirm, we would have to remand back to the board to consider the amount of money from the fund, correct? Which the client would be entitled to. Yeah, I think where the board's left it is. Because the crewman's not gone or anything about that. The board remanded to the state fire marshal to issue an eligibility letter. But the eligibility letter also is supposed to contain the deductible amounts. The state fire marshal determines what the deductible amount is. 5,000, whatever. They did not make that. So the state fire marshal still has that decision to make. So that's what they were remanded to. So if you affirm that. Yeah, that was put on pause pending this appeal. I take it. Sorry? That was put on pause pending this appeal. Yeah, I. That determination. Yes. Thank you. Any other questions from the panel? Very interesting. But anyway, let me ask you this. I'm going to steal Justice Lord's question. What's the standard of review on this case?  Do you mind if we get this later to know what people want? I think it's. . . It's a very serious question. It may ask that we get it from the. . . What the department has done, as I mentioned, that was what's the decision being reviewed or given deference to. What the department. . . What the state fire marshal did was create an affidavit a couple years after the release and to explain how from the reviewer of the application, explaining her thoughts or medical processes, how she evaluated the facts and gathered them and made a decision based upon the law. That looks like she was combining questions of fact and law, and that's what the state fire marshal, in my mind, is doing is wanting affirmation of a mixed question of fact and law. That's. . . So that's. . . That was my take on it. Which, under your take, would mean clearly erroneous as the standard of review. Yes. Okay. Thank you. Thank you. Mr. Scherner, we're back to you for five minutes. Thank you, Your Honor. As you're aware from our briefs, but just to make the point, the fire marshal's office does not look at the UST fund or the LUST program as an insurance fund. It certainly provides reimbursement and public funds to help, but it's an environmental regulatory program. The fire marshal has long administered and enforced the Gasoline Storage Act, and that's because of their expertise and their technical expertise in dealing with underground storage tanks and all the related tank systems. Like the surveys put them in, but here is an expert also in an environmental program, but they are a long-term technical expert as well. Going to the question of deference and the fact that the board is the adjudicator who goes up on review, I just also want to point out that certainly like when an agency is before a trial court, again, with a dispute, whether it's the Department of Labor, the IEPA, when they are having an argument that involves an action and an argument that ends up involving an ambiguous statute, and then that goes on appeal to the reviewing court, the appellate court doesn't defer if it finds that the statute is ambiguous to the trial court's decision. Even though it's reviewing the trial court's decision below, it still defers to the agency to the extent that the statute is ambiguous. And going just sort of back to the general question here of where does the release come from, the fact of the sort of, as the way your Honor put it, the moral hazard question, is this is a general question about what is the UST fund, what's the purpose of that fund, and what is the problem it's trying to address here. It does provide a way of reimbursement. It does provide a way to ensure that there is money to provide to clean up messes. However, it has a scope, as the cases we looked at reflect, that sometimes there are spills and releases from the above ground equipment which are not covered by it. There's still the parties who are involved, whether it's reliable in the service station order or other parties, they are still going to be subject both to liability and to obligations to clean up that mess. We're still at both agencies, whether the IEPA or the fire marshal or the attorney general or the local state's attorney still can go ahead and clean up those messes. But in the end, what this program is about is the special difficulties which arise from defects and leaks which start in that underground tank system. And that is not what we have here under the undisputed facts. So we ask that the court reverse the pollution control board's decision and read the statute 57.9 consistent with the fire marshal's reading of that provision to not provide for reimbursement and not provide releases which originated solely in the above ground equipment to not find those eligible under the USET fund. Unless your honors have any more questions. Thank you. Thank you. That concludes the argument on this matter. The court will take the case under advisement and you will hear from the court in due course.